1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

SAN JOSE DIVISION

7

8     UNITED STATES OF AMERICA,                 Case No.   5:23-cr-00101-EJD-1

               Plaintiff,                       **ORDER DENYING MOTION TO**
9                                               **DISMISS; DEFERRING REQUEST**
10         v.                                   **FOR ADVERSE INFERENCE**
                                                **INSTRUCTION**
11    ONOFRE SALAS-LOZANO,

               Defendant.                       Re: Dkt. No. 53
12
13

14         Defendant, Onofre Salas-Lozano ("Defendant"), is charged with Aggravated Sexual Abuse

15  in violation of 18 U.S.C. § 2241(a), Sexual Abuse in violation of 18 U.S.C. § 2242(1), and False

16  Statements to a Government Agency in violation of 18 U.S.C. § 1001(a)(2).  Indictment, ECF No. 1.

17         Defendant moves the Court to dismiss his indictment, or in the alternative, provide an

18  adverse inference instruction, based on two categories of lost or destroyed evidence: (1) evidence

19  the Government possessed but failed to preserve; and (2) evidence the Government failed to collect.

20  Mot., ECF No. 53.  The Government opposes Defendant's motion.  Opp'n, ECF No. 56; Reply, ECF

21  No. 60.

22         The Court held a hearing and heard arguments from both parties on October 30, 2024.  ECF

23  No. 71.  Upon review of the parties' briefing and in consideration of the oral arguments, the Court

24  **DENIES** Defendant's motion to dismiss his indictment and **DEFERS** Defendant's alternative

25  request for an adverse inference instruction.

26  **I.    BACKGROUND**

27         Beginning in February 2021, Defendant worked for Quality Services International, LLC

28

United States District Court
Northern District of California

1    ("QSI"), a janitorial service contracted with the Department of Veterans Affairs ("VA"), where he

2    supervised J.J.[1]  Mot. 1.  On July 7, 2021, J.J. reported to the VA police that Defendant raped her at

3    the VA hospital several days prior.  *Id.*

4          That same day, July 7, 2021, Defendant learned of J.J.'s report and went to the VA police

5    department to speak with them.  *Id.*  Defendant told the police: "I want to show you guys what is on

6    my phone. I have text and videos from the day after she says I attacked her that will prove it is not

7    true. You will see that she is just obsessed with me or something."  Decl. of Christoffer Lee ("Lee

8    Decl."), Ex. B, Report of Investigation ("July 9 Investigation Report"), ECF No. 55-3.  The police

9    did not review his phone and advised Defendant to stop discussing the incident.  *Id.*

10         On July 9, Special Agent Andres Gonzalez ("Gonzalez") and Investigator Miguel Martin

11   ("Martin") interviewed J.J.  Lee Decl., Ex. D, Memorandum of July 9, 2021, Interview ("July 9

12   Interview"), ECF No. 55-3.  J.J. stated that she had maintained a professional relationship with

13   Defendant prior to July 7, 2021, and they occasionally exchanged text messages and WhatsApp

14   messages about religious topics.  *Id.*  J.J. claimed that Defendant expressed romantic interest in her

15   around May 2021 and asked her to be in a relationship in June 2021, but she was not interested.  *Id.*

16   J.J. raised concerns about their age difference and Defendant's recent loss of his wife, stating that

17   she was looking for a serious relationship with a religious man.  After J.J. rejected his advances,

18   Defendant apologized, and their interactions continued normally until July 2, 2021.  *Id.*  J.J. alleges

19   that on July 2, 2021, Defendant requested that she help him move furniture in a patient room, closed

20   the door behind her, and raped her.  *Id.*  A Sexual Assault Nurse Examiner (SANE) later observed

21   bruises and tearing on J.J. consistent with a non-consensual sex act, and Defendant's DNA was later

22   found on J.J.'s underwear.  Opp'n 1.

23         J.J. specifically stated that she sent various religious-related YouTube videos to Defendant

24   after July 2, 2021, on his personal phone, work phone, and WhatsApp.  July 9 Interview.  J.J. sent

25   the videos because she believed they expressed how she felt, and she wanted Defendant to think

26

27   _____

[1] The Court will use J.J. to refer to the complaining witness.

28   Case No.: 5:23-cr-00101-EJD-1
     ORDER DEN. MOT. TO DISMISS; DEFERRING JURY INSTRUCTION REQUEST
                              2

1    about what he did to her.  *Id.*  J.J. handed her cell phone to Gonzalez at some point in the interview

2    to show him the messages.  *Id.*; *see also* Lee Decl., Ex. E, Transcript for Interview of J.J. ("July 9

3    Transcript"), ECF No. 55-3.  During his review of J.J.'s cell phone, Gonzalez noted that J.J. sent ten

4    YouTube video clips to Defendant between July 3 and July 6, but he did not reply.  July 9 Interview.

5    However, Gonzalez did not inquire about the videos.  *Id.*  J.J. offered to let the officers keep her

6    phone for evidence, but they quickly returned it, cautioning her that they might need it later to

7    record text messages and WhatsApp messages.  *Id.*

8         On July 20, 2021, Gonzalez and Martin interviewed Defendant.  Lee Decl., Ex. F,

9    Memorandum of July 20, 2021, Interview ("July 20 Interview"), ECF No. 55-3.  Defendant denied

10   having any sexual contact with J.J. on July 2, 2021.  *Id.*  He claimed that J.J. became romantically

11   interested in him in May 2021, but he did not reciprocate.  *Id.*  Defendant alleged that J.J. frequently

12   sent him unsolicited YouTube videos, prompting him to delete the messages and block her on his

13   personal cell phone.  *Id.*  He also stated that she constantly called him at work for trivial matters and

14   made excuses to meet him.  *Id.*  Defendant reported these behaviors to his supervisor, Reyna

15   Sanchez ("Sanchez"), who had to reprimand J.J. for her excessive calls, which Sanchez separately

16   confirmed was true.  Lee Decl., Ex. G, Memorandum of July 14, 2021, Interview ("July 14

17   Interview").  Defendant asserted that he repeatedly rejected J.J.'s advances, explaining that pursuing

18   a new relationship so soon after his wife's death would betray her memory.  July 20 Interview.  On

19   July 2, 2021, Defendant recalled asking J.J. to help him move the furniture in a patient room.  *Id.*

20   Once they were in the room, J.J. allegedly asked Defendant for a back massage and expressed

21   romantic interest in him again.  *Id.*  He declined, which he believes upset her because she started

22   crying.  *Id.*

23        Defendant played two videos he received from J.J. for the officers, noting that they were just

24   a "small sample" of what she sent him.  *Id.*  He described the videos as "creepy" and indicative of

25   obsession.  *Id.*  The officers reported that the video loosely expressed love  and romantic feelings.

26   *Id.*  Defendant sent these videos to the officers, which were preserved and later produced to defense.

27   *See id.*

28   Case No.: 5:23-cr-00101-EJD-1
     ORDER DEN. MOT. TO DISMISS; DEFERRING JURY INSTRUCTION REQUEST

United States District Court
Northern District of California

The transcript of the male voice narrating the first video states:

> Learn to understand that she really does all this for you, because she loves you, because she really saw in you something that nobody else saw. Because you'll never find one like her again, twice. Because if she preferred to be with you instead of being with another person, it's because something in her makes her love you with so much passion, with so much desire, with so much impetus. Don't let her go. Take care of her. Value her. Call her. Ask her how her day was. Ask her how things went. Ask her if she's tired, if she wants a coffee, if she wants you to clothe her, if she wants you to rest alongside her, if she wants you to hug her. Don't leave her exposed to isolation or loneliness, where you[r] warmth should cover her. Listen to her whenever you can. Listen to her always. Don't let her feel alone next to you.

Lee Decl., Ex. H, Transcript of July 20, 2021, Interview ("July 20 Transcript"), ECF No. 55-3.

The transcript of the male voice narrating the second video states:

> Something that men will never understand. The silence of a woman says a lot, when her heart tires of so much—of so much waiting, of so much trying. Of so much trying that she be given love, and begging. That she be heard at least once. The words will work. The performance will be noted. And she alone will leave. A moment will arrive in which she will tell you that everything is better than ever, that there's nothing wrong with her, that she feels happy. But, friend, you have hurt her inside. The pain that a broken heart generates is very, but very difficult, very difficult to overcome. Next to you she learned many things. She learned not to be overly trusting of people, to always be vigilant for her happiness before someone else's. To care for and achieve her goals. She learned that someone who truly loves her—

*Id.*

On October 21, 2021, law enforcement requested Defendant's work phone records from QSI but did not ask for the phone or its contents. *See* Lee Decl., Ex. J, Memorandum of Record, ECF No. 55-3. The records showed that that between March 15 and August 14, 2021, Defendant "made or received" 200 text, picture, and data messages to or from J.J.'s personal phone. *Id.* It is unclear how many messages were sent by each party. *See id.* The officers did not obtain records from the phone carrier or attempt to retrieve any of the messages, nor did they seek records from WhatsApp. *See id.*

On March 31, 2022, law enforcement contacted J.J. again to inquire whether she still had her phone. Lee Decl., Ex. I, Memorandum of March 31, 2022, Interview ("March 31 Interview"), ECF

United States District Court
Northern District of California

No. 55-3.  J.J. replied that the old phone "broke approximately two months earlier," but "some of the data from the broken phone was able to be transferred."  *Id.*  She added that she had not deleted any communications with Defendant from the old phone and was willing to provide the old phone to law enforcement.  *Id.*  However, the officers did not get the cell phone from J.J. that day, or at any point that month.  Instead, they contacted J.J. again on May 4, 2022, but she informed them that she no longer had it, having misplaced it during spring cleaning.  *Id.*

On March 10, 2023, about one year and eight months after her original interview, law enforcement obtained J.J.'s consent to search her current phone.  *Id.*  The oldest text message found was from December 2022, with no preserved messages between her and Defendant.  *Id.*

On April 6, 2023, Defendant was indicted.  Upon his arrest, officers searched his personal cell phone and provided a full forensic report.

On May 4, 2023, approximately one year and ten months after J.J.'s original interview, law enforcement inquired with QSI about Defendant's work phone.  *Id.*  QSI responded that they likely recycled or wiped it and gave it to another employee.  *Id.*

## II.    LEGAL STANDARD

"A district court may dismiss an indictment on the ground of outrageous government conduct if the conduct amounts to a due process violation."  *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991) (citations omitted).  If the government's conduct does not rise to the level of a constitutional violation, the court may still impose evidentiary sanctions, including adverse instructions.  *See United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011) (citing *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979) (en banc) (Kennedy, J., concurring)).

## III.    DISCUSSION

Defendant argues that he cannot present a complete defense and is therefore entitled to dismissal or, alternatively, an adverse inference instruction, because: (1) the Government had possession of J.J.'s cell phone but failed to preserve it; and (2) the Government failed to collect evidence from WhatsApp, Defendant's work phone, and phone carrier records.

1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.      Failure to Preserve

The standard for assessing the government's failure to preserve evidence hinges on whether the evidence is "materially exculpatory" under *California v. Trombetta*, 467 U.S. 479 (1984), or "potentially useful" under *Arizona v. Youngblood*, 488 U.S. 51 (1988).  A showing of bad faith is required if the evidence is potentially useful, but need not be shown if the evidence is materially exculpatory.

#### 1.      Possession of Evidence

As an initial matter, however, to challenge the failure to preserve evidence under *Trombetta* and *Youngblood*, a defendant must first show that the government had the evidence in its possession. Here, Defendant seeks a finding that the Government failed to preserve the content of J.J.'s cell phone, but the parties dispute whether the Government ever "possessed" J.J.'s cell phone.

Defendant claims that the Government possessed J.J.'s cell phone during her July 9 interview, where an officer physically held J.J.'s cell phone and reviewed its contents before returning it.  Defendant compares this situation to *United States v. Johnson*, 996 F.3d 200 (4th Cir. 2021), where law enforcement "possessed" a victim's cell phone but returned it to his family at some point without performing a forensic examination.

The Government argues that the officers never "possessed" J.J.'s cell phone because they never had "control" over it, citing a District Court of New Mexico decision that held "*Trombetta* and *Youngblood* address the failure of law enforcement officials to preserve evidence *under their control*."  *United States v. Thomas*, 61 F. Supp. 3d 1221, 1224 (D.N.M. 2014), *aff'd in part*, 849 F.3d 906 (10th Cir. 2017) (emphasis in original); *see also* Opp'n 7 (citing *United States v. McClure*, 918 F.2d 956 (4th Cir. 1990) and *McCargo v. Costello*, 235 F. Supp. 2d 173, 176 (E.D.N.Y. 2002) for factual comparison).  The Government further claimed during oral argument that law enforcement could only have "possessed" the cell phone if they booked it into evidence.

Ultimately, neither party provided a clear definition of "possession" for these purposes, or a similar case to guide the Court's determination.  Defendant's reference to *Johnson* offers little guidance since law enforcement there possessed the victim's phone for multiple months, rather than

United States District Court
Northern District of California

1  mere moments.  As for the Government's arguments, while the District Court of New Mexico in

2  *Thomas* found that "possession" under *Trombetta* and *Youngblood* requires "control," the Court

3  observes that neither decision actually discusses "control."  Further, the Government's additional

4  citations are factually distinguishable in that law enforcement officers never physically held the

5  evidence in their hands.  *See, e.g., McClure*, 918 F.2d (officers viewed video evidence but never had

6  in its possession the physical video tape); *McCargo*, 235 F. Supp. 2d at 176 (E.D.N.Y. 2002)

7  (officers never viewed or collected the video evidence they were accused of failing to preserve).

8       However, the Court need not answer whether the temporary handling of J.J.'s cell phone

9  constitutes "possession" at this time, as even if it did, neither *Trombetta* nor *Youngblood* provide for

10 dismissal here.

### 2.    "Materially Exculpatory" under *Trombetta*, or "Potentially Useful" under *Youngblood*

12      In *Trombetta*, the Supreme Court held that the government's duty to preserve evidence must

13 be limited to "evidence that might be expected to play a significant role in the suspect's defense," in

14 other words, "material" exculpatory evidence.  Evidence is materially exculpatory only if it: (1)

15 "possess an exculpatory value that was apparent before the evidence was destroyed," and (2) is "of

16 such a nature that the defendant would be unable to obtain comparable evidence by other reasonably

17 available means."  *Trombetta*, 467 U.S. at 488–89.  If the evidence is not "materially exculpatory,"

18 the court could still find the evidence "potentially useful" under *Youngblood*.  *Youngblood*, 488 U.S.

19 at 58.  The examination of "potentially useful" evidence differs from *Trombetta* in that it requires a

20 showing of bad faith to constitute a denial of due process.  *Id.*

21      Accordingly, the Court first examines whether the evidence on J.J.'s cell phone has apparent

22 material exculpatory value, and if not, whether the evidence is at least potentially useful.

24      Defendant argues that the content on J.J.'s cell phone would have included constant and

25 unsolicited one-way messages, such as the two YouTube videos in evidence.  *See* Mot. 3, 6.

26 Defendant argues that these messages are essential to impeach J.J. because they are inconsistent

27 with J.J.'s allegation of rape and inconsistent with the statements made in her July 9 interview, i.e.,

28 Case No.: 5:23-cr-00101-EJD-1

1  that Defendant pursued J.J. but she rejected him; that her relationship with Defendant "was only

2  work related"; and that "[a]ny text messages they exchanged were biblical phrases."  Reply 5.

3  Defendant urges that this impeachment evidence is particularly important in this case because it

4  would discredit  the only testifying eyewitness.  Mot. 11.  Defendant also argues that the

5  exculpatory value of the messages on J.J.'s cell phone was or should have been readily apparent to

6  the officers because Defendant told them about the nature of J.J.'s one-way texts and video

7  messages; the officers reviewed two of those videos; the officers confirmed that J.J. sent at least ten

8  videos to Defendant that went unanswered; and J.J. confirmed that she sent multiple videos and

9  messages to Defendant that went unanswered.  *Id.* at 6.

10        In contrast, the Government asserts that there is no definitive evidence that the messages

11  would exonerate Defendant.  Opp'n 12.  Instead, the content of the available videos could appear as

12  reflecting J.J.'s feelings of hurt and humiliation, which would be inculpatory rather than

13  exculpatory.  *Id.*  at 10.  Accordingly, the Government argues that the exculpatory value of this

14  evidence is speculative, not apparent.  *Id.*  And even if relevant videos existed, the Government

15  argues they would not significantly impact the defense due to the physical evidence in the case, i.e.,

16  the DNA and other observations of bruises and tearing consistent with a non-consensual act.  *Id.* at

17  10–11.[2]

18        Considering the totality of the circumstances, the Court finds that J.J.'s cell phone did not

19  have an apparent exculpatory value while being reviewed by the officers under *Trombetta*.  The cell

20  phone may provide helpful impeachment evidence, as it could contradict J.J.'s assertions that she

21  was not romantically interested in Defendant and only sent him religious messages.  Nevertheless,

22  the lack of possessing the record of real time messages would not significantly diminish his defense.

23  Defendant can still effectively cross-examine J.J. on the number of messages she sent and the timing

24  of her messaging using the two YouTube videos in evidence as examples of the universe of her

25

26  _____

27  [2] The Court declines the Government's invitation to draw a negative inference about the
    exculpatory value of these videos based on Defendant's conduct—the evidence makes clear that
    Defendant only deleted or blocked the messages prior to J.J.'s allegations.

28  Case No.: 5:23-cr-00101-EJD-1
    ORDER DEN. MOT. TO DISMISS; DEFERRING JURY INSTRUCTION REQUEST

United States District Court
Northern District of California

1    messaging.  Defendant can also still question law enforcement regarding the ten other YouTube

2    videos they referenced in their report, as well as their observations that Defendant did not respond to

3    her numerous messages.  Defendant could likewise examine Sanchez regarding her need to

4    discipline J.J. for excessively calling Defendant.  The evidence also does not show that any

5    exculpatory value of the videos was *apparent* rather than merely speculative.  The two sample

6    videos could be interpreted in different ways.  The videos could support Defendant's narrative that

7    J.J. was in unrequited love with Defendant, or likewise the Government's narrative that J.J. was hurt

8    and humiliated, and she wanted Defendant to reflect on what he had done.  *See United States v.*

9    *Drake*, 543 F.3d 1080, 1090 (9th Cir. 2008) ("The exculpatory value of an item of evidence is not

10   'apparent' when the evidence merely 'could have' exculpated the defendant.") (citing *Youngblood*,

11   488 U.S. at 56).

12         While the evidence is not materially exculpatory, for the reasons discussed in the prior

13   paragraph, the Court finds that the evidence was at least "potentially useful" as impeachment

14   evidence.  Accordingly, the Court will continue its analysis of the Government's conduct under

15   *Youngblood*.

16                             **3.      Bad Faith**

17         As discussed above, if the lost or destroyed evidence is "potentially useful," it may still serve

18   as a basis for dismissal if the defendant proves that the evidence was lost or destroyed in "bad faith."

19   Under *Youngblood*'s "bad faith" test, the defendant is required to show more than mere negligence

20   or recklessness.  *Youngblood*, 498 U.S. at 58.  "The presence or absence of bad faith turns on the

21   government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or

22   destroyed."  *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993) (citations omitted); *see also*

23   *Youngblood*, 498 U.S. at 58 (explaining that bad faith is demonstrated when "the police themselves

24   by their conduct indicate that the evidence could form a basis for exonerating the defendant"); *see*

25   *also United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011).

26         Defendant argues that law enforcement failed to preserve the content of J.J.'s cell phone in

27   bad faith because they knew the exculpatory nature of the evidence contained therein.  Mot. 7–9.  In

28

support, Defendant again highlights the following: he told officers about the nature of J.J.'s one-way texts and video messages; the officers saw two of those videos; J.J. confirmed that she sent Defendant messages to which he did not respond; and during J.J.'s interview, the officers saw record of ten of these YouTube videos that J.J. sent to Defendant. *Id.* Also relevant to this analysis is the Government's one year and eight month delay in finally searching J.J.'s cell phone. *Id.* Defendant argues that this delay shows bad faith, and their eventual efforts to search J.J.'s cell phone demonstrates that they knew the phone's contents had evidentiary value. *Id.* at 9. In support of these arguments, Defendant references *United States v. Zaragoza-Moreira*, where the Ninth Circuit held that a border patrol agent acted in bad faith because she failed to preserve video footage after the defendant "repeatedly alerted" her to its "potential usefulness." 780 F.3d 971, 979 (9th Cir. 2015). Defendant also cites *United States v. Cooper*, where the Ninth Circuit held that the government acted in bad faith when it allowed the defendants' lab to be destroyed, even though "[t]he equipment's value as potentially exculpatory evidence was repeatedly suggested to government agents." 983 F.2d 928, 931 (9th Cir. 1993).

The Government raises three primary points in response. Opp'n 9–12. First, the Government again argues that the two sample videos could be interpreted in different ways, so the officers could not have known that other videos on J.J.'s cell phone would be exculpatory. *Id.* Second, the Government argues that Defendant did not tell the officers that he had a consensual sexual relationship with J.J., so the officers could not have known that the content of J.J.'s cell phone would have revealed a romantic relationship. Opp'n 14. Finally, the Government highlights that there is no affirmative evidence of bad faith, such as the intentional destruction of evidence. However, the Government notably does not provide any argument or explanation as to why it took one year and eight months to finally search J.J.'s cell phone.

While the law enforcement's conduct is suspect, particularly their inexplicable delay in searching J.J.'s cell phone, the Court finds that the conduct does not rise to the level of bad faith. It is clear that law enforcement at least knew J.J. sent Defendant one-way messages containing YouTube videos, the samples of which show "love and romantic feelings." However, their

Case No.: 5:23-cr-00101-EJD-1
ORDER DEN. MOT. TO DISMISS; DEFERRING JURY INSTRUCTION REQUEST

knowledge is just the start of the inquiry.  A closer look at the cases Defendant cites is helpful here. In *Cooper*, the government charged the defendant for manufacturing methamphetamine.  *Cooper*, 983 F.2d at 930.  The defendant repeatedly told law enforcement that the equipment in the laboratory could not physically produce methamphetamine, but law enforcement destroyed the laboratory regardless, claiming that it was "contaminated."  *Id.*  However, there was no determination of actual contamination, and even if there was, destroying the lab was outside the scope of law enforcement's duties and practices.  *Id.*  In *Zaragoza-Moreira*, the government charged the defendant for transporting drugs, and the defense was duress.  *Zaragoza-Moreira*, 780 F.3d at 974.  The defendant repeatedly told law enforcement that she was trying to attract law enforcement's attention while she was waiting in a line next to the person who forced her transport the drugs, but law enforcement allowed the video footage of the defendant standing in that line to be destroyed.  *Id.* at 979.  Not only did law enforcement know that the defendant claimed she acted under duress, know that there was video footage of the defendant standing in the line where she tried to get law enforcement's attention, and confirm that the person forcing her to transport the drugs was in the line as well, they actively omitted this information from all three reports of the crime except the one prepared just before the motion to dismiss.  *Id.* at 980.

In these cases, there was active conduct beyond mere knowledge of the evidence—i.e., going outside of law enforcement's duties to inexplicably destroy the evidence, or omitting all evidence of the defendant's duress defense.  While law enforcement's delay here in finally searching J.J.'s cell phone is relevant to this inquiry, it is insufficient to show bad faith.  Unlike the cases cited above, law enforcement did not, for example, destroy the evidence themselves or make any attempt to hide the evidence.  In this way, the facts of this case more align with negligence or perhaps recklessness, but not bad faith.

\* \* \*

Therefore, the Court finds that the Government's failure to preserve the evidence on J.J.'s cell phone does not warrant dismissal under *Trombetta* or *Youngblood*.

### B.    Failure to Collect

Moving to the remaining evidence, Defendant argues that dismissal is warranted because the Government failed to collect evidence from WhatsApp, Defendant's work phone, or the phone carrier records.  Mot. 9.

*Youngblood* prohibits not just the bad faith failure to preserve potentially useful evidence, but also the bad faith failure to obtain it.  *See Miller v. Vasquez*, 868 F.2d 1116, 1121 (9th Cir. 1988); *see also Commonwealth of Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1117 (9th Cir. 2001) (noting that *Miller* "made it abundantly clear that due process requires law enforcement not just to preserve evidence already in hand, but to gather and collect" evidence whose potential exculpatory value is apparent).  Similar to *Youngblood*, *Miller* holds that the failure to collect potentially exculpatory evidence in bad faith, where the defendant is unable to gather comparable evidence by reasonable means, would violate the due process clause.  *Miller*, 868 F.2d 1120.

The bad faith analysis here mirrors the discussion above, although a few additional facts are relevant to the Government's failure to collect the other evidence.  Mot. 9.  First, the Government knew that Sanchez disciplined J.J. for excessively calling Defendant at work, thereby confirming that his work phone contained evidence of J.J.'s constant one-way communications.  *Id.*  Second, the Government knew there were 200 messages between Defendant and J.J. on his work phone, but still did not attempt to discover the content or sender of those messages.  *Id.*  Third, the Government knew there were relevant messages on WhatsApp because J.J. confirmed that she sent Defendant messages on his work phone, personal phone, and WhatsApp to ensure he received them.  *Id.*  The Government raises no arguments here that differ from those summarized above.

While these additional facts strengthen Defendant's argument that the Government knew there was useful information in WhatsApp, Defendant's work phone, and phone carrier records, there is still no evidence of an affirmative act showing bad faith.  Therefore, for the reasons discussed in the prior section, the Court also finds that the Government's failure to collect evidence does not warrant dismissal under *Miller*.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

### C.    Adverse Inference Instruction

If the government's conduct does not rise to the level of a constitutional violation, courts may still impose evidentiary sanctions, including adverse instructions. *See United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011) (citing *United States v. Loud Hawk*, 628 F.2d 1139, 1152 (9th Cir. 1979) (en banc) (Kennedy, J., concurring)).  In so doing, courts must balance "the quality of the Government's conduct and the degree of prejudice to the accused." *Id.* (internal quotation marks omitted).  The government bears the burden of justifying its actions, and the defendant bears the burden of demonstrating prejudice. *Id.* (quoting *Loud Hawk*, 628 F.2d at 1152).

In evaluating the Government's conduct,

> the court should inquire whether the evidence was lost or destroyed while in [Government] custody, whether the Government acted in disregard for the interests of the accused, whether it was negligent in failing to adhere to established and reasonable standards of care for police and prosecutorial functions, and, if the acts were deliberate, whether they were taken in good faith or with reasonable justification.

*Loud Hawk*, 628 F.2d at 1152.  Also relevant to the analysis is "the nature and degree of federal participation" and "whether the government attorneys prosecuting the case have participated in the events leading to loss or destruction of the evidence." *Id.*

In evaluating prejudice against the defendant, the court must consider, among other things,

> the centrality of the evidence to the case and its importance in establishing the elements of the crime or the motive or intent of the defendant; the probative value and reliability of the secondary or substitute evidence; the nature and probable weight of factual inferences or other demonstrations and kinds of proof allegedly lost to the accused; the probable effect on the jury from absence of the evidence, including dangers of unfounded speculation and bias that might result to the defendant if adequate presentation of the case requires explanation about the missing evidence.

*Id.*

The Court finds it appropriate to defer further discussion regarding an adverse inference instruction at this time.  Whether these circumstances fall under *Loud Hawk*, particularly the degree in which Defendant is prejudiced by the missing evidence, is better discussed at the charging conference after evidence has been presented at trial.  The Court welcomes further discussion regarding the protocols for raising this issue at the upcoming pretrial conference.

Case No.: 5:23-cr-00101-EJD-1
ORDER DEN. MOT. TO DISMISS; DEFERRING JURY INSTRUCTION REQUEST

**IV.    CONCLUSION**

Based on the foregoing, the Court **DENIES** Defendant's motion to dismiss his indictment and **DEFERS** Defendant's alternative request for an adverse inference instruction.

**IT IS SO ORDERED.**

Dated: November 12, 2024

_____

EDWARD J. DAVILA
United States District Judge